# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 10, 2001

## STATE OF TENNESSEE v. LAWRENCE DOUGLAS

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 98-15004-05     Bernie Weinman, Judge**

---

**No. W2000-01749-CCA-R3-CD  - Filed August 10, 2001**

---

The defendant, Lawrence Douglas, was indicted by a Shelby County Grand Jury for one count of especially aggravated robbery and one count of attempted first degree murder, both Class A felonies. He was found guilty of especially aggravated robbery and attempted second degree murder, a Class B felony, and sentenced to twenty years for the especially aggravated robbery conviction at 100% and a concurrent sentence of twelve years for the attempted second degree murder conviction, as a Range I, standard offender, for an effective sentence of twenty years. The defendant challenges: (1) the ruling of the trial court excluding testimony of the defendant's grandmother concerning his childhood and (2) his sentences. Finding no error, we affirm the judgment of the trial court. However, we remand for entry of corrected judgments in order that the appropriate classes of the convictions may be indicated on the judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed and Remanded for Entry of Corrected Judgments**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

C. Michael Robbins, Memphis, Tennessee, for the appellant, Lawrence Douglas.

Paul G. Summers, Attorney General and Reporter; Mark E. Davidson, Assistant Attorney General; William L. Gibbons, District Attorney General; and Rosemary Andrews, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In this appeal as of right, the defendant challenges his convictions and sentences for especially aggravated robbery and attempted second degree murder, presenting the following specific issues:

I. Whether the trial court erred in excluding as irrelevant the testimony of Maudina Douglas concerning the defendant's childhood experiences; and

II. Whether the defendant's convictions and sentences violate the due process and equal protection provisions of the state and federal constitutions because of disparity between his sentence and that of his codefendant.

## FACTS

The events of this case took place on a summer night in a residential area of Memphis known as Orange Mound. The victim, Louis Hill, testified that on July 21, 1998, he went to a boarding house on Park Avenue around 6:00 p.m. to find a man who owned a Memphis janitorial service and for whom Hill was working. On this evening, Hill was not able to locate his boss but instead found a dice game going on behind the boarding house. Mr. Hill joined the game for about thirty minutes. The codefendant, John Montgomery, and Jerion Craft were among the players. Hill had approximately $140 with him; he was wearing a gold herringbone necklace with a medallion designed with an anchor and a symbol of Jesus, and a gold nugget ring.

Hill did not remember either winning or losing any money to speak of at the game. He left the game and went to visit a friend who lived nearby but returned to the boarding house after about fifteen minutes, again looking for his boss. He walked around back, and the dice game was still going on, although with some different players. As he was leaving, he saw two men coming along a path that led from other neighboring backyards into the area of the dice game. Hill testified that, as he continued walking toward Park Avenue, someone grabbed his shirt from behind. Hill spun around and was shot in the lower groin area. He fell back onto the ground, and his assailant demanded his money. Hill said he told the shooter to take the money and handed him the $140 or so that he had in his pocket. The second man he recognized as Montgomery. Montgomery hit him in the face and yanked the necklace from his neck and took his ring. Hill heard someone say "here come the police," and his assailants then ran. Hill testified that he made it to the front yard where someone called an ambulance. Prior to the arrival of the ambulance, Hill was found by police at approximately 9:30 p.m. on the porch of the boarding house. He was transported to the Regional Medical Center where he underwent three hours of surgery, followed by eleven days of recovery at the hospital and three months of convalescence at home before being able to begin light, part-time work.

Jerion Craft testified that, on the night of the shooting, he and John Montgomery had been gambling with others in the crap game behind the house on Park Avenue in Orange Mound. He saw the defendant, armed with a pistol, grab the victim and fire the pistol. He had not heard the two arguing prior to the shot. Additionally, he did not see any movement by the victim which made it appear that he was reaching for a pistol, himself. Craft said that the victim was wearing a small medallion that evening, which the defendant removed from him after the shooting. Montgomery got

something from the victim, but Craft could not see what it was. He later told Memphis police officers what he had observed.

Sergeant Joseph Scott with the Memphis Police Department interviewed the victim. He had learned the names of the codefendant and the defendant from Jerion Craft. Sergeant Scott prepared photographic lineups for Hill to view. Hill had already identified the codefendant, Montgomery, as the person who was with the defendant and who hit him in the face and took his necklace and ring. On August 2, Hill was able to immediately pick out the defendant from a photographic lineup as the person who shot him. The photograph used by Sergeant Scott was the most recent on file for the defendant, a photograph that had been taken some nine days after the crime date, as a result of a traffic violation. The defendant was wearing a gold, herringbone necklace, which the victim identified as the one stolen from him on the night of the shooting.

The defendant testified that he had lived in "the Mound" off and on most of his life. On July 21, 1998, the defendant, days from turning nineteen, was living on Cella Street in Orange Mound with his aunt. On this particular evening, the codefendant, John Montgomery, came to the defendant's house and told him about a crap game that was underway behind a boarding house some two blocks away on Park Avenue. The house was directly across the street from the Park Avenue Store, a location known among residents of the community as a place to purchase drugs. Once purchased, some individuals then crossed to the boarding house where they could use drugs, drink beer, and gamble. Montgomery, who had just come from the dice game, told the defendant that among the gamblers that evening was one who was a "pluck" or an "easy mark" with money on him. The two then left for the game, but not before Montgomery retrieved a small, black pistol that he had left at the defendant's home. The defendant explained that Montgomery had given him the gun for his protection.

The defendant's version of what then happened differs substantially from that testified to by the victim but is consistent with his affirmative defense of self-defense. According to the defendant, he got into the dice game to cheat the "pluck" out of his money. The defendant apparently had the ability to "slick roll" the dice, which he explained:

> Setting the dice on where I want them. And, stack them. When I
> stack them I spread them instead of rolling them. And, look like they
> rolling and all the time they spinning on the number I set them on. I
> do them from snake eyes on up to twelve, from two on up to twelve.

The defendant testified that he played in the dice game with the victim for about twenty minutes and had won $150 to $200 from the victim, when he was caught cheating. The victim became angry and started calling the defendant names. According to the defendant, Montgomery slipped the gun into the defendant's back waistband. When the victim seemed to be reaching for a weapon, the defendant pulled the gun from his back waistband and shot the victim once and ran.

-3-

After the shooting, the defendant ran back to his home where, some thirty minutes later, Montgomery showed up. According to the defendant, the two were "sitting there chitchatting about some rocks he had got and a necklace he had got." The defendant gave Montgomery $30 in cash for the necklace. It was a gold herringbone chain necklace with a religious medallion designed with an anchor and a symbol of Jesus. The defendant testified that he suspected that Montgomery had taken the necklace from the victim. The defendant was photographed by the police nine days later, apparently as part of a booking for a traffic offense on July 30, 1998, wearing the necklace. As to the gun, the defendant testified that he and Montgomery took it to the home of Jerion Craft, who was told by Montgomery to "take care" of it.

## ANALYSIS

### Issue I.  Admissibility of Evidence of Defendant's Childhood

According to the defendant's version of the facts, he shot the victim in self-defense. This defense is established by Tennessee Code Annotated Section 39-11-611, which states, in pertinent part:

> **Self-defense.**— (a) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.
>
> . . . .
>
> (d) The threat or use of force against another is not justified if the person provoked the other individual's use or attempted use of unlawful force, unless:
>
> (1) The person abandons the encounter or clearly communicates to the other the intent to do so; and
>
> (2) The other nevertheless continues or attempts to use unlawful force against the person.

Id. § 39-11-611(a), (d) (1997). The test for justification by reason of self-defense is, therefore, a threefold test: "[T]he defendant must reasonably believe he is threatened with imminent loss of life

or serious bodily injury; the danger creating the belief must be real or honestly believed to be real at the time of the action; and the belief must be founded on reasonable grounds." Id. § 39-11-611 Sentencing Commission Cmts.

The evidence the defendant sought to put before the jury was, according to the defendant, necessary to meet this threefold test and show that the defendant reasonably and honestly believed that he was in imminent danger of death or serious bodily injury. The evidence at issue had two basic parts: (1) that the defendant had been shot in the head approximately one year earlier, apparently in a random shooting, and the bullet was still lodged in his head; and (2) that he had lived for a period of time with his mother, who was addicted to crack cocaine, and that he ran wild, drinking and using drugs. The proffered evidence was to come in through the testimony of the defendant's grandmother, Maudina Douglas. In a jury-out hearing concerning the admissibility of this evidence, defense counsel explained to the trial court the significance of the proffered testimony of Ms. Douglas:

> What I'm seeking to do, Judge, is simply to inform the jury that Mr. Douglas, within a year or so prior to this incident, was shot, period. He was shot, he has a bullet in his head. It's inoperable, can't be removed and his mother or grandmother, one or the other, will testify to corroborate that. And, that he is of a heightened let's say, nervousness, or sensitivity or sensibility and he's a little prone to think maybe somebody's out to get him. That's as far as I plan to go with it. As far as childhood, I wasn't going to trot out a whole dysfunctional childhood. But, I do think it's relevant in order that the jury understand and determine what was his state of mind on the night in question. I do think it's important that the jury understand that he did get, fairly early on, an introduction to what I'm calling the drug sub-culture around the City of Memphis. Again, no great detail. But, just that as a ten or eleven year old, he was aware of the fact of crack cocaine addiction and what it does and what goes on around it. And, then you add to that the fact that he was shot, that's going to also, I anticipate, come out, as far as why he frequently goes armed in order to protect himself. But, that's as far as I intend to go with it. I think that ought to be permitted.

Subsequently, out of the presence of the jury, Maudina Douglas, the defendant's grandmother, testified how his life had changed after age eight when he moved from her Orange Mound house to live in east Memphis with his mother: "Well, he started staying out long as he wanted, all night long or either she would have him, she would let him drink, she would let him smoke weed with her. So, he had his own way. He did what he wanted to do when he was with her." Ms. Douglas said that she did not know what the defendant did while he was "in the streets," only when he was with her. Also, she testified as to the defendant's being shot in 1997:

A. He had a gunshot wound on the left side, just near the eye and bullet lodged in the back of the eye and they said they couldn't remove it. If they did it would do more damage than it would good.

Q. And, after that event, after his release from the hospital, did you notice any change in his behavior?

A. Yes, he was seemed a bit nervous. He had headaches and anybody came up on him to[o] fast it would frighten him. And, if he went, left the house going anywhere, constantly looking behind him like he was afraid or something.

The trial court ruled in the following manner regarding this testimony: "[T]he testimony about his growing up, his running wild in the streets, his mother being on drugs, the Court finds that to be irrelevant to the issues here on trial and will not allow that." However, the trial court allowed the testimony regarding the fact that the defendant had been shot in the head some months earlier as corroborative of his own testimony concerning the bullet in his head and the fact that it made him "jittery" and fearful of being shot again.

This court will not reverse the decision of a trial court to exclude evidence based on its lack of relevance unless the trial court has abused its discretion. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997) (citations omitted). Abuse of discretion, in this context, essentially, contemplates a situation where the "court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997) (citing Ballard v. Herzke, 924 S.W.2d 652, 661 (Tenn. 1996)). Accordingly, "[a]lthough a decision made under this standard will not be lightly reversed on appeal, the discretion of the trial court is not without limits." State v. Gilliland, 22 S.W.3d 266, 273 (Tenn. 2000).

Here, the challenged ruling involves the relevance of testimony concerning the defendant's childhood. Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is admissible unless a rule excludes it. See id. 402 Advisory Commission Cmts. "Evidence which is not relevant is not admissible." Id. 402.

The defendant argues that evidence of his childhood was relevant because it showed that he grew up around the criminal drug sub-culture and so was familiar with its violence. The result of this familiarity, the defendant argues, made him honestly and reasonably believe that the victim was

reaching for a gun to shoot him.[1]  The State counters that whether the defendant drank, smoked marijuana, or stayed out late as a child was not relevant to whether he acted in self-defense when he shot the victim.  We agree with the State.  Testimony regarding an undisciplined childhood is not relevant to the defendant's alleged belief that the victim made a "pocket play" just before the defendant shot him.

Additionally, we note that Ms. Douglas did not offer testimony concerning what the defendant did in Orange Mound but rather what he did while living with his mother in "East Memphis."  Ms. Douglas was not able to link the defendant's childhood problems with the geographical area where this crime occurred, or with any individual present at the crime scene, or with the circumstances surrounding the robbery and shooting.  Furthermore, nothing in the record suggested that either drugs or alcohol played any role in the commission of this offense.  When questioned on cross-examination by the State as to why, if the defendant was, as he suggested, extremely nervous about being shot again, knowing how violent the streets could be, he deliberately put himself in "an illegal dice game, in Orange Mound, behind a crack house, with a friend that was armed, and start[ed] to cheat."  The defendant responded:  "Just coming outside is a dangerous situation."

We conclude that the trial court did not abuse its discretion by excluding evidence of the troubled childhood of the defendant as irrelevant in that such evidence failed to make it more probable or less probable that the shooting by the defendant was an act of self-defense.

## Issue II.  Disparity in Sentences

In his second issue, the defendant contends that his convictions and sentences violate his rights to due process and equal protection of the law guaranteed by the Fourteenth Amendment of the U.S. Constitution and by Article I, Section 8 of the Constitution of Tennessee.  This claim is based on the differing sentences of the defendant and his codefendant, John Montgomery, who pled guilty to aggravated robbery and aggravated assault and received a sentence of eight years according to a plea bargain agreement with the State.[2]  The defendant contends that the difference between his codefendant's sentence of eight years at 30% and his sentence of twenty years at 100% is grossly

---

[1]The defendant asserts that the holding in State v. Gilliland, 22 S.W.3d 266 (Tenn. 2000), applies to his case in that evidence of his childhood is "background" evidence crucial to the jury's ability to fully evaluate his claim of self-defense.  Defendant's reliance on Gilliland is misplaced.  The issue there was the admissibility of evidence of a prior shooting by the accused that the State sought to present pursuant to Tennessee Rule of Evidence 404(b).  The State argued that the "background" evidence was being offered, not as propensity evidence, but to show the the context of the crime.  The Gilliland court concluded that such evidence was admissible only where it filled a chronological or conceptual void in the State's theory of the case, thus avoiding jury confusion.  See id. at 272-73.  Here, the only question is whether the childhood evidence is relevant pursuant to Rule 401, not whether the childhood evidence is propensity evidence admissible for some "other purpose" pursuant to Rule 404(b).

[2]Although the judgment forms for John Montgomery were entered as an exhibit to the hearing on the motion for a new trial, the forms were not included with the record.

-7-

disparate and violative of the principles of the Criminal Sentencing Reform Act of 1989, as well as his constitutionally protected rights. The State argues that the disparity between sentences is justified based on the facts of the case. As to these claims, the trial court stated the following at the joint sentencing hearing and hearing on the motion for a new trial:

> In taking into consideration the argument as to the disparity of sentences. The Court does not feel that what was argued is what was the intent of the act. I think the Court - - The act was someone - - the feeling being that someone convicted of the same crime, under the same circumstances, with the same background, should receive the same punishment.
>
> Understand, the argument is, well, this is between the two people involved in the same crime. There was proof in this case that Mr. Douglas had more of an involvement in this crime.
>
> But I don't think there was anything in the intent of the legislature in passing the statute that says there could not be a negotiation with a co-defendant, and that would bar any increased punishment for a defendant who did not enter into a negotiated agreement.
>
> . . . .
>
> The Court, for the same reason the Court indicated previously, feels that there's not a violation of the statute nor a violation of the Constitution, to have the two defendants sentenced to different amounts of - - different punishments in this matter.

Before assessing these claims, we will first review the evidence. The defendant admitted that he fired the shot at close range into the victim. The jury rejected his theory of self-defense, convicting him of shooting the victim and causing serious bodily injury and also of taking $140 from him. The codefendant hit the victim in the face and yanked the necklace and ring from his body. The codefendant also helped conceal the gun. While there was evidence that the codefendant told the defendant about the dice game and came with the defendant for the purpose of cheating the victim, nothing in the evidence suggested that it was anyone other than the defendant who grabbed the victim's shirt to stop him from leaving; shot the victim in the lower abdominal area; and demanded the victim's money.

Claiming that the two had similar culpability, the defendant argues that his codefendant "played a material role in providing the gun used in this offense and in retrieving the gun later and disposing of it." However, it was the shot fired by the defendant which resulted in the victim's spending three hours in surgery, eleven days in the hospital, and three months convalescing at home.

Thus, in considering the defendant's claims that his due process and equal protection rights were violated, we note that he, not the codefendant, shot the victim and that he, unlike the codefendant, rejected a guilty plea proposal from the State. However, following his conviction, he now insists that his sentence, following a trial, must be measured against that imposed on the codefendant, following a guilty plea.

As we understand the defendant's argument, his right to due process and equal protection of the law were violated when, following his trial, he, as the shooter, received a greater sentence, although the longer of his sentences was the presumptive minimum, than did his co-defendant, who entered a plea of guilty to a lesser offense.

### A. Due Process

It is without question that the length of sentence for a defendant who is convicted following a trial is not circumscribed by that received by a codefendant, who was here less culpable. The court noted in United States v. Sparks, 2 F.3d 574, 587 (5th Cir. 1993):

> Sparks also contends that he was denied due process of law because only those co-defendants who elected to go to trial, as opposed to those who pled guilty, had their sentences enhanced for possession of firearms. Sparks, however, may not use the sentences received by his co-defendants as yardsticks for the sentence he argues he should have received. United States v. Harrison, 918 F.2d 469, 475 (5th Cir. 1990). This is especially true when the co-defendants pled guilty and cooperated with the government. The sentences of such co-defendants "are obviously the result of leniency and are not relevant to the present constitutional inquiry." United States v. Devine, 934 F.2d 1325, 1338-39 (5th Cir. 1991), cert. denied, 502 U.S. 1065, 112 S. Ct. 954, 117 L. Ed. 2d 121 (1992). Sparks elucidates no other facts in support of his due process claim. Consequently, we find his claim to be without merit.

The defendant has presented no authority for the argument that his due process rights were violated by the fact that he received a longer sentence following his trial than did his codefendant, who entered a plea of guilty. Thus, we conclude that this claim is without merit.

### B. Criminal Sentencing Reform Act of 1989

The defendant argues that the differing sentences are violative of the Sentencing Reform Act. While a stated goal of our sentencing act is the "fair and consistent treatment of all defendants by eliminating *unjustified* disparity in sentencing," Tenn. Code Ann. § 40-35-102(2) (emphasis added), nothing in our law prohibits differences in sentences among codefendants where a codefendant, while accountable as a principal, was not "tainted with that degree of guilt as was defendant."

McGowen v. State, 427 S.W.2d 555, 560 (Tenn. 1968); see also State v. Greg Lee Sword, No. 03C01-9203-CR-00074, 1993 WL 100192, at *5 (Tenn. Crim. App. Mar. 31, 1993) (concluding that disparate sentences were appropriate where defendant placed gun in victim's neck, fired twice, and forcibly removed property from victim; codefendant was not armed and did not personally remove property). Our sentencing code clearly supports an "individualized, case-specific inquiry to determine the range of sentence . . . ." Sword, 1993 WL 100192, at *5.

The defendant notes that his conviction by a jury of especially aggravated robbery, a Class A felony, placed him within the ambit of the statutory provision requiring that the trial court begin calculating his sentence at the midpoint in the appropriate range, see Tenn. Code Ann. § 40-35-210(c), which in this case was twenty years. The defendant apparently contends that this statute unconstitutionally restricted the trial judge's ability to equitably sentence the defendant. This court has stated that the "Tennessee General Assembly has the exclusive authority to designate what conduct is prohibited and the punishment for that conduct." State v. Turner, 919 S.W.2d 346, 362 (Tenn. Crim. App. 1995). The defendant's rights to due process was not violated by the imposition of a sentence based on the law and a punishment that existed at the time he committed the crimes. See id.

We conclude that there was sufficient justification for the disparity between the sentences and that the defendant was convicted and sentenced based on duly enacted criminal laws of this state. This argument is without merit.

### C. Equal Protection

As for his claim that his right to equal protection of the laws was violated, the defendant argues that he and his codefendant have not been treated similarly, apparently in the application of sentencing laws, and that there is no rational or logical ground for any distinction in their sentences, other than the fact that the codefendant came into custody of the police before the defendant. The State counters that the sentence imparted to the codefendant was part of a negotiated plea agreement and is irrelevant to the sentencing process of the defendant.

According to the State and the record, the codefendant was arraigned on January 1, 1999, and pled guilty as part of his plea agreement on April 20, 1999. The defendant was not in custody until approximately fourteen months after the crime, when he was arrested on unrelated charges.

Although an accused does not have a constitutional right to plea negotiations, see Mabry v. Johnson, 467 U.S. 504, 507, 104 S. Ct. 2543, 2545-47, 81 L. Ed. 2d 437 (1984), the record indicates that the defendant was offered a plea agreement of fifteen years and rejected it, choosing rather to go to trial, as was his right.[3] Obviously, the codefendant's convictions and sentences resulted from

---

[3]As to the difference in the plea agreements offered, this court has determined that plea bargaining is a matter "entirely within the district attorney general's discretion." State v. Head, 971 S.W.2d 49, 51 (Tenn. Crim. App. 1997).

(continued...)

his agreement with the State, while the defendant's convictions and sentences resulted from the trial and sentencing processes. Our supreme court has stated that "things which are different in fact or opinion are not required by either [the federal or state] constitution to be treated the same." Tennessee Small School Systems, 851 S.W.2d at 153 (citations omitted; State ex rel. Stewart v. McWherter, 857 S.W.2d 875, 876 (Tenn. Crim. App. 1992) ("Equal protection requires that all persons similarly situated must be treated alike and, ordinarily, legislatures may determine what groups are different so long as the classification has a reasonable relationship to a legitimate state interest."). This was not a difference in treatment imposed by the State but rather one resulting from the individual choices made by the defendant, who elected to go to trial, and the codefendant, who elected to plead guilty. This issue is without merit.

## CONCLUSION

Based upon the foregoing authorities and analyses, we affirm the judgments of the trial court. However, the matter is remanded for entry of corrected judgment forms in order that the appropriate classes of the convictions may be indicated on the judgments.

_____
ALAN E. GLENN, JUDGE

---

[3](…continued)
In Head, the defendant and three codefendants pled guilty to especially aggravated robbery and conspiracy to commit especially aggravated robbery for the robbery of a sporting goods store during which the defendant struck an employee with a crow bar, fracturing his skull and shattering his cheekbone. This court determined that the State could not be forced to offer the defendant the same guilty plea agreement offered the other three codefendants. In Head, the State argued that the defendant's violent assault with the crow bar justified the State's decision not to offer the same reduction of the offense to robbery, a Class C felony, as had been offered and accepted by the three codefendants. See id. at 50.